CHANDLER, J., for the Court.
¶ 1. This is an appeal from a judgment of divorce entered in the Chancery Court of Hancock County, Mississippi dissolving the marriage of Margie Ferro and Charles Ferro. Margie Ferro has appealed the following issues:
(1) WHETHER THE TRIAL COURT ERRED IN GRANTING THE AP-PELLEE A DIVORCE ON THE GROUNDS OF CRUEL AND INHUMAN TREATMENT.
(2) WHETHER THE TRIAL COURT ERRED IN EQUITABLY DIVIDING THE ASSETS OF THE PARTIES.
(3) WHETHER THE TRIAL COURT ERRED IN ITS AWARD OF REHABILITATIVE ALIMONY AFTER MAKING AN EQUITABLE DIVISION OF THE MARITAL ASSETS.
(4) WHETHER THE TRIAL COURT ERRED IN DENYING BOTH THE APPELLANT AND APPELLEE ATTORNEYS’ FEES AFTER MAKING AN EQUITABLE DIVISION OF THE MARITAL ASSETS.
¶ 2. Finding no error, we affirm the ruling of the trial court.
FACTS
¶ 3. Robert Charles Ferro and Margie Nell Ferro were married on August 12, 1992, in Greenwood, Mississippi. Robert was an air traffic controller for the Federal Aviation Agency working at the Greenwood/Leflore Airport. He was also in the Air National Guard with twenty-two years of service. Prior to his marriage to Margie, Robert had obtained a federal license to sell guns and was operating a business known as the Cop Shop. Each weekend, Robert would travel to gun shows and set up booths to sell various types of guns and *756 accessories. Margie began assisting Robert with the gun shows shortly before their marriage. Margie worked at an insurance company as an agent and secretary.
¶ 4. Both Robert and Margie had previously been married and each brought separate non-marital property into the marriage. Margie owned a three bedroom home located in Sidon, Mississippi and a three bedroom trader in Gore Springs, Mississippi. She also owned forty acres of land in Holmes County. Robert had an inventory of guns and gun accessories valued at five thousand dollars. In December 1993, Robert retired from the Air National Guard. Robert’s marriage to Margie covered fifteen months of that service. In 1994, Robert retired from the Federal Aviation Agency. The parties were married for twenty-two months of that service.
¶ 5. Following his retirement from the FAA and the Air Guard, Robert continued to participate in gun shows and Margie would assist him. In 1995, Robert and Margie moved to Hancock County, where they lived together until their first separation in January of 2000. Robert’s mother lived with the couple most of the time while they lived in Hancock County. She contributed money to the household and loaned them approximately eleven thousand dollars to build a shop. In 1998, Margie and Robert’s mother had a disagreement and Robert moved his mother to Florida.
116. Margie had three sons from a previous marriage. In 1999, Margie’s thirty-six year old son, Eugene Moss, moved into the marital home. Eugene had been charged with grand larceny in Michigan and decided to move to Mississippi. Robert agreed to let Eugene move into their home in order “to get himself squared away.” Two months later Eugene moved to Canada but returned shortly thereafter and resumed living with the couple.
¶ 7. Robert asserts that he had no say or control as to whether Eugene continued to live at the marital home. According to Robert, Eugene did not actively seek employment and spent most of the days drinking alcohol. Margie refused to make Eugene leave the home. She provided Eugene with money for daily expenditures out of the joint funds of the couple. On January 1, 2000, Robert and Margie had an argument. The next day, Eugene attacked Robert and physically assaulted him. The altercation occurred when Robert returned home from church and found Eugene in his work shop drunk. Eugene accused Robert of hitting his mother and immediately began attacking him.
¶ 8. Robert called the Hancock County Sheriffs Department and had Eugene arrested. Robert filed criminal charges against Eugene. Robert told Margie that Eugene had to move out of the house, but she refused to force Eugene to move. Margie told Robert that she would file criminal charges against him if he did not drop the charges against her son, Eugene. Robert refused and Margie immediately filed charges against Robert for simple assault.
¶ 9. Robert filed a complaint for divorce on January 5, 2000, and a temporary hearing was held January 28, 2000. At the hearing, Robert agreed to give Eugene eleven hundred dollars for a rental apartment if he would move out of the home. Margie also allowed Eugene to use a 1985 Chevrolet truck.
¶ 10. Eugene pled guilty to simple assault. Robert was subsequently found not guilty on the simple assault charge Margie filed against him.
¶ 11. Robert and Margie decided to try to make the marriage work so Robert moved back into the marital home. Yet, in August 2000, Eugene moved back into the *757 marital home over Robert’s objections and notwithstanding the history of violence between the two. Margie told Robert the living arrangement was only temporary. Eugene made use of the household’s contents and used Robert’s tools and work shop never returning tools to their proper place. The marital problems continued to mount, and the couple sought counseling to no avail. Robert’s blood pressure began to escalate after Eugene moved into the home. Robert had never suffered from high blood pressure in the past. Robert said he felt intimidated in his own home and received no understanding or consideration from Margie. She always took Eugene’s side in all the disagreements, and she refused to make Eugene move out of the marital abode.
¶ 12. Due to the tension in the marriage caused by Eugene, Robert proceeded with the divorce. Three days prior to the chancery court’s entering its temporary order on November 15, 2001, Eugene wrecked and totaled one of the parties’ cars that was uninsured. Eugene received serious injuries in the car wreck. He continued to live in the marital home with Margie caring for him. Eugene had no medical insurance, and Margie insisted that Eugene continue to live with her until his disability benefits were approved.
¶ 13. After a three day trial, the chancery court entered an order granting Robert a divorce on the ground of habitual cruel and inhuman treatment. The court divided the parties’ assets, and awarded Margie rehabilitative alimony for a period of a year.
STANDARD OF REVIEW
¶ 14. This Court reviews the facts of a divorce decree in the light most favorable to the appellee. Fisher v. Fisher, 771 So.2d 364, 367(¶ 8) (Miss.2000). In domestic relations matters, this Court will not reverse the findings of a chancellor unless the findings are manifestly wrong, clearly erroneous, or if the chancellor applied an incorrect legal standard. Henderson v. Henderson, 757 So.2d 285, 289-90 (¶ 19) (Miss.2000). We may reverse a chancellor’s findings of fact only where there is no “substantial, credible evidence in the record” to justify the findings. Id.
LAW AND ANALYSIS
1. WHETHER THE TRIAL COURT ERRED IN GRANTING THE AP-PELLEE A DIVORCE ON THE GROUNDS OF CRUEL AND INHUMAN TREATMENT.
¶ 15. Habitual cruel and inhuman treatment may be established by a showing of conduct that either (1) endangers life, limb or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance. Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993); Gardner v. Gardner, 618 So.2d 108, 113-14 (Miss.1993). A preponderance of the evidence, rather than clear and convincing evidence may be used to grant á divorce on the ground of habitual cruel and inhuman treatment. Smith v. Smith, 614 So.2d 394, 396 (Miss.1993). A subjective standard is used to determine the effect of the conduct on the offended spouse as, opposed to a normative standard. Morris v. Morris, 783 So.2d 681, 688 (¶ 22) (Miss.2001).
¶ 16. Margie allowed her thirty-six year old adult son to live in the marital abode for extended periods. She insisted that *758 Eugene continue to live with her in the marital home over the objections of Robert. Eugene has made use of the couple’s household contents, automobiles and Robert’s work shop. Eugene has even gone so far as to physically attack and injure Robert in his own home. Eugene pled guilty to the assault charge stemming from the attack. Margie responded to the attack by filing charges against Robert, of which he was found not guilty at trial.
¶ 17. Robert ' provided Eugene with money to get a rental apartment of his own in an effort to resume his marriage with Margie without Eugene’s interference. Undaunted, Eugene moved back into the marital home two months later. Robert continued to object to Eugene’s presence in the marital home but Margie refused to make Eugene move.
¶ 18. Eugene wrecked and totally destroyed one the parties’ automobiles. Margie continued to refuse to force Eugene to leave the marital home. There was testimony by Ronald and Brenda Deb-bell, Mends of the couple, of the deteriorated marital relationship. There was testimony that Margie was quick-tempered and often made accusatory remarks to Robert. Neither Ronald nor Brenda observed Robert mistreating Margie verbally or physically.
¶ 19. This Court is of the opinion that Robert should not have to endure the presence of Margie’s thirty-six year old son in the marital home. Eugene’s presence has placed Robert in reasonable apprehension of life, limb and health. Margie’s disregard for Robert’s safety and well being is nothing short of brutal. Margie’s conduct in persisting that Eugene continue living in the marital abode was so offending to the marital relationship and well-being of Robert that he was left no choice but to dissolve the marriage. Although Eugene was the person who inflicted physical injury on Robert, the conduct of Margie destroyed the sanctity of the marital relationship when she refused to make Eugene leave the marital home. The evidence is sufficient to find that Robert met his burden of proof necessary to establish grounds for a divorce based on habitual cruel and inhuman treatment. The chancellor did not abuse his discretion in granting the divorce. This assignment of error is without merit.
(2) WHETHER THE TRIAL COURT ERRED IN EQUITABLY DIVIDING ’ THE ASSETS OF THE PARTIES.
¶ 20. An appellate court’s scope of review in domestic relations eases is limited, and an appellate court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. Johnson v. Johnson, 823 So.2d 1156, 1159(¶ 7) (Miss.2002) (citing Ferguson v. Ferguson, 639 So.2d 921, 930 (Miss.1994); Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990)). Furthermore, the chancellor’s findings of fact will not be reversed if there is any substantial credible evidence which supports them. Dunaway v. Busbin, 498 So.2d 1218, 1221 (Miss. 1986).
¶ 21. Margie contends that the lower court correctly classified the Cop Shop as a marital asset but committed error in setting the value of the business at fifty-thousand dollars. Additionally, Margie argues that the trial court committed error in its holding which allowed her to occupy the home for a period of six months after which time she was assessed rent at the rate of eight hundred dollars a month to be applied against her interest in the home. Margie further argues that the trial court erred in the division of the couple’s motor homes.
*759 ¶ 22. The Ferguson guidelines are eight considerations that the Mississippi Supreme Court adopted for chancery courts to use when they equitably divide marital property. Those guidelines include:
1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage, and
e. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets;
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise;
3. The market value and the emotional value of the assets subject to distribution;
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity, and
8. Any other factor which in equity should be considered.
Ferguson, 639 So.2d at 928.
¶ 23. The law of this state requires equitable, not equal, distribution of the marital estate. Peterson v. Peterson, 797 So.2d 876, 880 (¶ 17) (Miss.2001). Equitable division is the fair determination of the division of marital property based on both spouses’ contributions during the marriage. Traxler v. Traxler, 730 So.2d 1098, 1102 (¶ 21) (Miss.1998).
¶ 24. The trial court concluded that the value of the Cop Shop was fifty thousand dollars and made an equitable distribution of the value by awarding Margie one-third of the value and Robert two-thirds. Robert and Margie had full time jobs at the time of the marriage. Prior to the marriage, Robert had acquired a license to sell guns and was operating a business known as the Cop Shop. Robert valued the assets of the Cop Shop at five thousand dollars. During the marriage, both Robert and Margie worked at gun shows. Margie asserted that she was fired from her job at the insurance company because she left work early on Fridays to set up for gun shows.
¶ 25. After the parties’ final separation in May 2001, Robert sold the Cop Shop inventory for twenty-five thousand dollars although there was a temporary court order prohibiting the sale of any marital assets. Margie sold a gold coin collection for four thousand one hundred dollars in spite of the temporary court order restraining the dissipation of marital assets. Margie alleged the value of the Cop Shop to be two hundred thousand dollars but provided no documentation to support the assertion.
*760 ¶ 26. After analyzing the Ferguson factors, the chancellor rejected both of the parties’ valuations of the Cop Shop. The chancellor estimated the Cop Shop to be worth fifty thousand dollars and awarded Margie a one-third interest which was approximately seventeen thousand dollars. It should also be noted that Margie owns non-marital real property with improvements valued at fifty-eight thousand dollars. The chancellor’s recitation of facts after the discussion of the Ferguson factors was sufficient. This court cannot say the chancellor abused his discretion, was manifestly wrong, was clearly erroneous or applied an erroneous legal standard.
¶ 27. Margie argues the trial court’s order regarding the sale of the parties’ homestead is unworkable. The trial court ruled that Margie could occupy the home for six months and then be assessed rent at the rate of eight hundred dollars per month against her interest. Margie complains that the homestead needs repairs in order to enhance the marketability of the home.
¶ 28. The value of the homestead was set at one hundred fifty-two thousand dollars. There was no mortgage against the property. The trial court ordered the proceeds from the sell of the home to be split and that both parties would do everything to protect the investment. Robert was required by the court to pay all of the utilities during this initial six month period. If Robert chose to move into the homestead when Margie vacated the home then he would be charged the same rental payment that was to be paid by Margie. The chancellor did not abuse his discretion regarding the use, occupancy and sale of the parties’ homestead.
¶ 29. Margie also argues the trial court erred in awarding Robert the 1973 motor home. The 1977 motor home that was awarded to Margie needed repairs. The court noted that the 1973 motor home was the one Robert used as his home during the periods of separation from Margie. The trial court did not abuse its discretion in awarding Robert the 1973 motor home.
(3) WHETHER THE TRIAL COURT ERRED IN ITS AWARD OF REHABILITATIVE ALIMONY AFTER MAKING AN EQUITABLE DIVISION OF THE MARITAL ASSETS.
¶ 30. We now turn to the issue of whether the chancellor erred in his award of rehabilitative alimony to Margie. A limited standard of review is used to evaluate a chancellor’s decision. “The chancellor’s decision on alimony will not be disturbed on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error.” Tilley v. Tilley, 610 So.2d 348, 351 (Miss.1992) (citing McNally v. McNally, 516 So.2d 499, 501 (Miss.1987)). Additionally, all awards to a spouse must be considered together when deciding whether they are equitable and fair. Hubbard v. Hubbard, 656 So.2d 124, 130 (Miss.1995) (citing Ferguson, 639 So.2d at 929).
¶ 31. The guidelines to be used in determining whether alimony is appropriate in a particular case were established in Armstrong v. Armstrong, 618 So.2d 1278 (Miss.1993). They are: (1) the income and expenses of the parties; (2) the health and earning capacities of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) the presence or absence of minor children in the home; (7) the age of the parties; (8) the standard of living of the parties, both during the marriage and at the time of the support determination; (9) the tax consequences of the spousal support order; (10) fault or misconduct; (11) wasteful dissipation of assets by either *761 party; or (12) any other factor deemed just and equitable. Armstrong, 618 So.2d at 1280.
¶ 32. While the chancellor did not consider all of the Armstrong factors, his decision on alimony cannot be said to be against the overwhelming weight of the evidence. Unlike property division, an on-the-record analysis of the Armstrong factors is not required. Thompson v. Thompson, 816 So.2d 417, 420(¶ 9) (Miss.Ct.App. 2002).
¶ 33. Margie asserts that the award of rehabilitative alimony for a year in the amount of five hundred dollars per month is error. She argues that she has numerous physical ailments. Robert’s income is derived from his FAA and National Guard retirements. He also has a note receivable from the sale of the Cop Shop. Robert has a monthly gross income of three thousand seven hundred fifty four dollars. However, three thousand one hundred fifty-four of this amount is derived from his retirement of which the court has awarded Margie a portion. Aside from his retirement, Robert has six hundred dollars of income a month. Robert’s monthly expenses include rent, alimony, car payment and health insurance for Margie.
¶ 34. Margie is fifty-nine years of age. She has skills as an insurance agent and computer operator. The evidence produced at trial did not support any medical disability that would inhibit her from gainful employment. Furthermore, many of the expenses claimed are a result of supporting a household of two persons, Margie and her thirty-six year old son, Eugene.
¶ 35. The Ferro homestead was appraised at one hundred fifty-two thousand dollars and had no mortgage. Margie’s equitable share from the sale of the homestead would be seventy-six thousand dollars which does not include the value of her other real property and the forty acres of land in Holmes County that she owns. Margie is to receive approximately seventeen thousand dollars for her marital interest in the Cop Shop. The trial court also granted Margie twenty thousand dollars in proceeds from the sale of a boat and twenty thousand in cash as her share of the individual retirement accounts.
¶ 36. In compliance with our standard of review, we hold that the chancellor’s findings of fact were not against the overwhelming weight of the evidence. The chancellor clearly examined the income tax returns and financial declarations of the parties. The findings of fact address the Armstrong factors, indicating that the chancellor took them into consideration in determining whether and how much alimony Margie should receive. The chancellor considered Margie’s need for financial security as well as her earning capacity. We therefore affirm the chancellor’s holding with regard to alimony.
(4) WHETHER THE TRIAL COURT ERRED IN DENYING BOTH THE APPELLANT AND APPELLEE ATTORNEYS FEES AFTER MAKING AN EQUITABLE DIVISION OF THE MARITAL ASSETS.
¶ 37. Margie and Robert argue the chancellor abused his discretion in denying them attorney’s fees. An award of attorney’s fees is generally left to the discretion of the chancellor. Gray v. Pearson, 797 So.2d 387 (¶ 34) (Miss.Ct.App. 2001). In assessing the appropriateness of an award, the chancellor should consider the relative financial ability of the parties. McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). Furthermore, the chancellor’s findings on the issue of attorney’s fees will not be disturbed unless manifestly wrong. *762 Cumberland v. Cumberland, 564 So.2d 839, 844 (Miss.1990).
¶ 38. The chancellor noted that neither Robert nor Margie had money to pay their attorney’s fees. However, the trial court found each party had sufficient assets from which to pay their respective fees. Therefore, the chancellor did not abuse his discretion in denying attorney’s fees.
¶ 39. THE JUDGMENT OF THE HANCOCK COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS AND GRIFFIS, JJ., CONCUR.